**PORZIO BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
Morristown, New Jersey 07962
(973) 538-4006
*Attorneys for Plaintiff Ultraflex Systems Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ULTRAFLEX SYSTEMS, INC., | Case No. |
| Plaintiff, | Civil Action |
| vs. | |
| GEORGE S. MAY INTERNATIONAL CORPORATION, | **COMPLAINT WITH JURY DEMAND** |
| Defendant. | |

Plaintiff Ultraflex Systems, Inc., a New Jersey corporation ("Ultraflex"), by its attorneys, Porzio Bromberg & Newman, P.C., as and for its complaint against Defendant George S. May International Corporation ("GSM" or "Defendant"), a Delaware corporation, alleges as follows:

## INTRODUCTION

1.      This diversity action seeks compensatory, treble, and punitive damages from Defendant arising from its deceptive business practices.

2.      Ultraflex is a worldwide distributor of fabrics used in the sign and billboard industry located in Randolph, New Jersey.  The company has approximately 30 employees. Defendant George S. May International Corporation is a consulting firm headquartered in Park Ridge, Illinois that promotes itself as "one of the most established management consulting firms in the United States."  Upon information and belief, Defendant has over 800 employees.

1332620

3.      Given the economic recession caused by the credit and housing collapse in 2008, Ultraflex, like many other companies, is interested in improving its bottom line, particularly when a firm like GSM makes guarantees that if retained, it will increase the prospective client's profitability through increased sales and cost-savings by "at least 2%."

4.      To induce Ultraflex to do business with GSM in late 2009, GSM's employees made a series of verbal representations to Ultraflex's Chief Executive Officer, John E. Schleicher, Jr. that caused Mr. Schleicher on Ultraflex's behalf to sign a pre-printed management consulting agreement prepared by GSM.   As described below, GSM's employees assured Ultraflex that it would provide competent, professional guidance and advice and implement all necessary measures quickly.   GSM assured Ultraflex that in addition to increasing its profitability by at least 2%, GSM's consulting services would quickly produce those results at or under $75,000.

5.      As a result of the statements made by GSM's employees, which statements were made with knowing or reckless disregard for their truth, Ultraflex relied upon such misrepresentations and wired over $141,000 to GSM over a 17-day period in December 2009, for which Ultraflex received virtually no value.

6.      As a result of GSM's deception and fraudulent conduct, Ultraflex: (a) was induced to pay substantial money to GSM that should be returned in full with interest thereon; (b) was induced to turn over all proprietary corporate and financial information to GSM that has not been returned to Ultraflex despite demand therefore; and (c) gave GSM's employees Ultraflex's American Express credit card account, on which GSM charged expenses amounting to over $7,500 for travel and lodging to and from New Jersey, without properly seeking Ultraflex's advance approval.

1332620

7.     Instead of GSM providing professional advice and information that Ultraflex could benefit from, GSM spent 17 days at Ultraflex's offices in Randolph, New Jersey, largely wasting Ultraflex's time and money.  GSM failed to fully interview in appropriate detail all of Ultraflex's operational managers or take the time to fully understand the distribution business, instead producing flowcharts and "reports" that provided no useful guidance.

8.     By reason of GSM's pattern of deceptive practices, Ultraflex properly terminated GSM's services on December 22, 2009 and demanded that all funds paid and charged to its corporate credit card be refunded.  GSM refused.

9.     Upon information and belief, GSM has a corporate department that addresses complaints received from dissatisfied clients, and that numerous complaints have been lodged with GSM and/or governmental authorities, including the Better Business Bureau, similar to those made herein regarding GSM's deceptive sales practices.

10.    By reason of GSM's pattern of deception, Ultraflex is entitled to compensatory and treble damages, plus costs and attorneys fees incurred, under New Jersey's State RICO statute N.J.S.A. 2C:41-1 et seq., and compensatory and punitive damages by reason of GSM's common-law fraud, breach of contract, breach of fiduciary duty, conversion, and trespass.


**THE PARTIES**

11.    Ultraflex Systems, Inc. is a corporation duly organized and existing under the laws of the State of New Jersey, having its principal offices at 1578 Sussex Turnpike, Randolph, New Jersey 07869.  Ultraflex is a worldwide distributor of industrial vinyl and textile fabrics and accessories used in the sign and billboard industries.

1332620

12.     Upon information and belief, GSM is a corporation organized and existing under the laws of the state of Delaware, and maintains its principal place of business at 303 South Northwest Highway, Park Ridge, Illinois 60068.  Upon information and belief, GSM portrays itself as a consulting agent that is "one of the most established management consulting firms in the United States, [and that] since 1925 has been helping business owners improve their operations, profits, efficiency and effectiveness."

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), as there is complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred in this district, and defendant is subject to the personal jurisdiction of the United States District Court of the District of New Jersey as of the date of this action's commencement.

## ALLEGATIONS COMMON TO ALL COUNTS

15.     In or about early December 2009, John Schleicher, Jr. ("Schleicher"), Ultraflex's owner and Chief Executive Officer, met with Steve Lardieri, a GSM representative, at Ultraflex's offices in Randolph, New Jersey to discuss GSM's retention.

16.     Mr. Lardieri had contacted Ultraflex to solicit its business and informed Schleicher that GSM would conduct an evaluation, after which it will "streamline" Ultraflex's processes and procedures, and make the company more profitable and efficient.

1332620

17.     Among the documents that GSM provided to Ultraflex to entice GSM's retention as consulting agent included literature stating that GSM has been in business for over 80 years and is "committed to providing management consulting services of the highest quality."

18.     Lardieri specifically represented to Schleicher in meetings with him that if retained, GSM would: (a) increase Ultraflex's annual profitability by at least 2%, (b) revamp Ultraflex's corporate policies and procedures to make the company more efficient, (c) terminate, hire, and train Ultraflex outside sales and internal support employees to maximize productivity as necessary; and (d) improve inventory control, projections, and budgeting so that new internal procedures could be implemented.

19.     Thereafter, a GSM employee named "Tony," followed in Lardieri's footsteps at Ultraflex's offices and reassured Schleicher that GSM would provide all of the foregoing services in a competent and professional manner.  He repeated the guarantee that GSM's services would result in at least 2% greater profitability for Ultraflex.

20.     Tony also promised Schleicher that GSM would send Ultraflex highly competent people from GSM who were the "best of the best."

21.     Tony promised Schleicher that GSM's services would be completed at a cost of not more than $75,000.   He said that GSM's staff executives and project leader, Jeff Gutting, would charge $255 per hour for their services, with an estimate of 300 hours spent in total.  Tony represented to Schleicher that, because of Ultraflex's relatively small size, it would "most likely cost Ultraflex much less than 300 hours and less than $75,000."

22.     Tony soon attended a sales meeting at a nearby Marriott Hotel when Mr. Schleicher introduced Tony to a group of Ultraflex employees.  Tony explained to the group that

GSM would make Ultraflex more efficient and profitable, and that GSM's team would install new company procedures and polices to greatly improve Ultraflex.

**GSM Fraudulently Induced Ultraflex to Enter into the Agreement**

23.    On or about December 4, 2009, Tony gave Schleicher a pre-printed four-page contract entitled "Authorization for Management Service and Method of Payment" (the "Agreement").  The Agreement states, among other things, that the client may cancel it at any time at the close of business on any given day, and that reports would be rendered by GSM to Ultraflex on a regular basis.

24.    Based upon the many verbal representations made by GSM's employees, Ultraflex, by John Schleicher, signed the Agreement on December 4, 2009 because he believed that the representations made were true.

25.    The Agreement states that achievements realized "depend on many factors, including human aptitudes and cooperation of the client's staff, which factors are not within the control of the [GSM.]"  By implication, the reasonable inference is that as long as the client cooperates with GSM's executive team, GSM will provide the resources and expertise to get the results represented, and that such expertise and resources are within GSM's control.

26.    Ultraflex therefore fully cooperated with GSM at all relevant times, and Schleicher so informed Ultraflex's employees of the importance to do so.

27.    The Agreement also states on the last page "action memorandum" dated December 4, 2009.  That action memorandum states that, for "Job No. 566321," three executives and a project director would start work at Ultraflex's offices on December 5, 2009 at 9:00 A.M.  The action memorandum also states in GSM's handwriting:  "Estimated Hours: 300."

1332620

28.     As such, Schleicher believed, consistent with what had been represented, that the maximum time spent to achieve the objectives would be 300 hours at $255 per hour.

29.     GSM asked Ultraflex to sign additional "copies" of the Agreement.  Ultraflex did so but later discovered that what was signed was not a true copy.  Rather, a close look of the "copy" of the action memorandum on the second copy suggested that 300 *additional* hours at $255 per hour had been authorized for a different project, when in fact, at no time was an additional 300 hours discussed or agreed, and contradicted Tony's representations that *all* services would cost "less than $75,000."

30.     Moreover, GSM never explained that Ultraflex would be required to pay for multiple airfare trips and hotel expenses for personnel to travel to and from New Jersey from areas throughout the United States.

31.     On Saturday, December 5, 2009, five representatives from GSM appeared at Ultraflex's offices in Randolph.  Schleicher was present in the office on Saturday, and gave GSM's staff and project leader, Jeff Gutting, complete and immediate access to Ultraflex's computers, warehouse and files as GSM requested.

32.     Based upon the many statements GSM's employees and representatives had made to Schleicher, he reasonably concluded that GSM's services would be top caliber, that its fees would approximate $75,000, that GSM would be able to competently, efficiently and thoroughly assess Ultraflex's operations and procedures, and that its team would create a meaningful road map that GSM would implement.

1332620

**GSM's Services Provided Little or no Value**

33.     Despite GSM's specific promises and representations, it soon became apparent that GSM's team of experts had little or no plan to coordinate Ultraflex's business information, and had no plan to effectively accomplish the objectives that Ultraflex believed would be attained.

34.     Basis research was inexplicably ignored, such as detailed interviews of Ultraflex's operational management, and questions and answer sessions concerning the existence, and utility, of financial information, along with key performance indicators.  Such tasks should have been done *before* GSM embarked on creating financial plans and projections.  This resulted in waste and inefficiency for which Ultraflex paid.

35.     GSM's staff traveled from all parts of the United States to be at Ultraflex's offices between December 5 and December 22, but they proved to be ineffectual or incompetent.  For instance, Tony at GSM told Schleicher that one of the staff executives from GSM assigned to Ultraflex, Mr. Mark Jaswantkumar, was an expert in Ultraflex's accounting software, known as MAS 90.  Mr. Jaswantkumar spent little time discussing the software with Schleicher, even though he was available at Ultraflex's offices on December 5 when the team arrived.

36.     Ultraflex's personnel soon observed that Mr. Jaswantkumar was largely ignorant of the MAS 90 program and was unable to answer Ultraflex's questions.  Ultraflex thereafter advised Jeff Gutting, the project leader, of this.  Had it not been for Ultraflex's objections, nobody at GSM was willing to rectify the problem.

37.     Mr. Schleicher left the country on business from December 8 though December 15, 2009.  Before leaving, Jeff Gutting promised Schleicher that when he returned from abroad,

he will "see changes" at Ultraflex and that GSM will have trained its sales people and changed its procedures.

38.     When Schleicher returned from abroad on December 15, he saw that there had been no changes made, no sales training given, and that no new procedures had been implemented as promised.

39.     When Schleicher voiced his concerns, Gutting told Schleicher that more time would be needed to achieve the results promised, and convinced him to allow GSM to remain at Ultraflex and be paid much more than the $75,000 initially quoted.  Gutting then told Schleicher for the first time that sales training would not be included in the 300 hour estimate given.

40.     Despite Ultraflex's reluctance to do so, it agreed to give GSM additional opportunities to live up to its representations.  GSM still failed to perform.

41.     Throughout its services, GSM took information from Ultraflex's files and computers in an incomplete or incorrect manner.  For example, soon after GSM was producing reports and projections, Bora Agilonu was told that certain comparative financial information might require adjustments before assumptions or conclusions could be reached due to one-time expenses, timing issues, and/or expense reclassifications and restatements.

42.     Instead of investigating, questioning or accepting the accounting concepts suggested, Agilonu ignored them, and continued to make projections that were wrong.   During a power-point presentation conducted at Ultraflex's offices by Agilonu in mid-December, he still made errors and invalid assumptions that affected his projections. Accounting concepts were altered to fit GSM's skewed projections, failing to take into consideration reasonable accounting adjustments, all of which had been raised to Mr. Agilonu.

1332620

43.     Moreover, Agilonu's power-point presentation was given in broken English and very difficult to understand.  He was also not able to answer Ultraflex's specific questions about Ultraflex's unique challenges.  He replied that he could not answer the questions "yet."

44.     At the end of GSM's second week in Randolph, a new GSM representative named Bradley Webber appeared.  Schleicher was told that Webber would help train and motivate sales people, something Schleicher was eager to see.   However, Webber's services too proved valueless.

45.     Ultraflex's sales team is located in different areas of the country.  As such, a reasonable approach to train such a disbursed group would have been to send a written e-mail or memo to the sales team, reasonably in advance, to coordinate a meeting.  Unfortunately, no such sales training ever took place because no one from GSM, including Mr. Webber, had the foresight or sensibility to plan the meeting in advance.

46.     On Sunday, December 20, 2009, Webber told Schleicher that he would prepare a sales compensation plan.  No meaningful discussions occurred so that Webber would gain insight into industry norms, the company's objectives, or sales personnel's reasonable expectations or concerns.  Thus, once again, GSM proceeded to provide its "expert" services without meaningful dialogue or a sensible course of action.

47.     GSM provided periodic reports as per the Agreement.  But the reports largely set forth what GSM *hoped* to accomplish, not necessarily that clear objectives *had been met* or that Ultraflex agreed that GSM was proceeding in a proper or efficient manner.

48.     GSM also issued "sales strategies" reports as part of their ongoing sales planning and control services.  Such reports, however, said nothing new or useful.  For instance, GSM's reports stated there is a need to "develop a format for the client to develop market share goals"

1332620

and that GSM "with the client [will] develop an outline of the sales presentation." But saying in written reports (and having the client sign them, as GSM often did) that goals will be developed and implemented versus GSM meaningfully executing on those goals -- as GSM assured would be done -- are markedly different.

49.     Accordingly, Ultraflex did not sign off on any prepared GSM daily report acknowledging that an objective *had been* met or that Ultraflex was satisfied with GSM's services.

50.     GSM issued such "strategies" as described above and provided flowcharts and diagrams that likewise provided no value. For example, GSM: (a) created a new "proposed" organization chart based on Ultraflex's pre-existing chart, merely rearranging certain personnel; (b) issued a colored chart regionalizing markets in the United States and Canada without regard to the realities of where salespeople were located; (c) set forth stated goals such as "increase sales" by regurgitating what Ultraflex told GSM about the industry and the company; (d) compared sales in 2009 with sales in 2008, which comparative information Ultraflex already had in its possession; and (e) issued an "Overall Company Process" flowchart as of December 21, 2009, which provided an intake box of "customer submits an order online, by fax, email or mail" to an end box of "Payment made" and "Payment not made," with useless commentary provided in between, such as "Why was product not available?" and "error occurs here – Solutions need to be designed and implemented!"

51.     GSM's flowcharts were prepared without Ultraflex ever asking for such documents, and were very different from the representations made verbally to Schleicher assuring him that GSM would implement beneficial policies and procedures.

11

52.     Similarly, Ultraflex cannot reasonably be expected to receive a benefit from the many vague, written recommendations that GSM made.  For example, GSM reported that Ultraflex should "monitor payments and collections" and should "engage the collections department."  Such fundamental concepts are already firmly part of Ultraflex's practice.  In fact, Ultraflex's accounts receivable department is in regular contact with the CFO to appropriately discuss strategies when faced with a delinquent debtor.  Either GSM did not bother to evaluate these facts, or it was simply following a script when making its recommendation.

53.     GSM also spent time during its 17-day engagement at Ultraflex's offices reporting that revenue can improve if steps are taken to address the failure to recapture monies paid for Duty Drawbacks.  Duty Drawbacks occur when Ultraflex pays a duty when shipping materials to another country after the United States had already collected a duty, thus entitling Ultraflex to a refund or "drawback" upon presenting proper documentation.  Ultraflex is well aware of this issue, and again gained nothing of value from GSM pointing out the obvious.

54.     GSM proceeded haphazardly and inefficiently, often regurgitating information that Ultraflex had provided in a different format; failed to properly investigate or assess the company's financial statements and information before making time-consuming financial projections or recommendations; offered Ultraflex vague objectives in the guise of written reports without appropriate plans to execute or realize on the objectives; failed to follow instructions and advice given by Ultraflex's personnel; and spent thousands of dollars in corporate charges beyond what was reasonable and what Ultraflex reasonably expected.

1332620

**GSM Insisted on Prompt Payment and use of Ultraflex's Credit Card**

55.     The Agreement states that Ultraflex would pay "reasonable travel and lodging expenses" for GSM's executives.

56.     In that regard GSM told Ultraflex's CFO after being retained that John Schleicher had approved GSM's use of Ultraflex's corporate American Express account to charge expenses directly.  Schleicher never pre-authorized such use.  GSM charged Ultraflex's credit card over $7,500 for travel and lodging expenses incurred by several GSM employees who came from all over the United States.

57.     GSM never obtained pre-approval as represented to Ultraflex's CFO to charge expenses directly to Ultraflex's credit card.

58.     Meanwhile, GSM billed Ultraflex on a regular basis for the many hours expended and which steadily mounted each day.

59.     GSM required that Ultraflex make regular payment for the services by wire transfer.

60.     As required, Ultraflex wired payments to GSM's account in the amounts of $11,543.60 on December 8; $31,837.26 on December 11; $39,582.27 on December 11; and $58,943.18 on December 17, totaling $141,906.31.

61.     Based upon GSM's representations, Ultraflex continued to make wire transfers and allow charges to be incurred as GSM required in the hope that the situation described would improve and because Ultraflex had already invested substantial time and money and hoped to a achieve a benefit in return.

62.     Ultraflex reasonably expected, based upon the representations GSM had made, that GSM would offer beneficial insight in identifying specific procedures that would increase

sales and profitability and that GSM would begin implementing such measures.  Instead, GSM proved to tell Ultraflex nothing it did not already know, and often needed to be corrected.

**Ultraflex Properly Terminates the Agreement**

63.     On Monday, December 21, 2009, Schleicher met with Webber in Schleicher's office.  Webber then admitted that he was upset that virtually nothing had been accomplished according to GSM's promises.

64.     Webber said that he understood Schleicher's legitimate concerns about GSM's failure to deliver on its promises, and that the matter "needed to be reviewed with GSM's managing director."

65.     By then it was clear to Schleicher that GSM's methods were deceptive and inefficient, and that GSM would try to run up the meter further at Ultraflex's expense.

66.     By letter dated December 22, 2009, Ultraflex properly terminated GSM's services and set forth its reason in detail as required by the Agreement.

67.     Instead of honoring the termination, however, GSM's employee Margret Drorbaugh unlawfully remained on Ultraflex's premises for no stated reason, and had to be escorted off of the premises.  Ms. Drorbaugh objected to Ultraflex's termination, and inexplicably said to Schleicher when she learned of the termination that she is not "a scam artist."

68.     Gutting tried to convince Schleicher that GSM should continue working with Ultraflex to accomplish Ultraflex's objectives.  However, given the deception and false promises made, and lack of any meaningful progress, Ultraflex was no longer willing to give GSM still further opportunities to overcharge the company.

1332620

69.     Ultraflex had been billed and paid GSM $141,906.31 plus over $7,500 in American Express charges.

70.     Upon termination, Ultraflex requested that all of its private documents, printed reports, files and property be returned immediately.  GSM refused.

## FIRST COUNT
### (Violation of New Jersey State RICO, N.J.S.A. 2C:41-1 et seq.)

71.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein at length.

72.     GSM has engaged in a pattern of racketeering activity by engaging in ongoing deceptive business practices in violation of N.J.S.A. § 2C:41-1(a)(1)(o) and §§ 2C:21-7(b) and (h), by knowingly or recklessly making misleading statements concerning: (a) the quality and quantity of GSM's services when in fact such quality and quantity differs from the misleading representations made; (b) the time and cost that it would take to accomplish Ultraflex's objectives, when in fact it takes longer than represented and GSM reasonably knew as much; (c) the level of competence and experience of GSM's executives assigned to Ultraflex, who were purported as the "best of the best," when in fact the competence and experience level was below what was represented; (d) the steps that GSM would actually implement for Ultraflex in meeting Ultraflex's objectives, when in fact GSM took no steps to train or set up new procedures; (e) approval of Ultraflex's credit card to incur expenses; and (f) the lack of GSM's expertise reasonably needed to achieve the objectives efficiently, all in furtherance of GSM's objective to have Ultraflex pay GSM fees and expenses for as long as possible.

73.     GSM has additionally engaged in a pattern of racketeering activity by engaging in wire fraud in violation of N.J.S.A. § 2C:41-1(a)(2) and 18 U.S.C. § 1961(1)(B) in directing

1332620

Ultraflex to wire payment from Ultraflex's account to GSM's account on a routine basis in furtherance of its scheme to collect all money quickly without regard to Ultraflex's rights.

74.   GSM is both a person and enterprise within the meaning of N.J.S.A. §§ 2C:41-1(b) and (c) and received income and property from Ultraflex, which affects trade and commerce, by participating in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of N.J.S.A. § 2C:41-2(c).

75.   GSM's unlawful actions undertaken by its agents and employees were related to each other in time and purpose, all designed to extract as much money from Ultraflex for as long as possible.

76.   Upon information and belief, separate and apart form the pattern of deception upon Ultraflex, GSM has engaged in similar deceptive practices when acting as consulting agent for other persons or companies throughout the United States, which in turn has resulted in similar complaints being filed against GSM and with the Better Business Bureau.

77.    Ultraflex has been damaged in its business by reason of the foregoing pattern of unlawful conduct, and is entitled to a refund of all moneys paid to and charged by GSM, together with treble damages and costs of suit, including reasonable attorneys' fees, as authorized by N.J.S.A § 2C:41-4(c).

## SECOND COUNT
### (Common Law Fraud)

78.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein at length.

79.   Although GSM knew that it could not reasonably make any commitments or representations to Ultraflex until it understood its business, operations, and finances, GSM

1332620

nonetheless represented to John Schleicher at Ultraflex that GSM would provide professional guidance and advice, and then implement complete measures for Ultraflex through competent execution to achieve "at least 2%" greater profitability in short order, including training its sales staff and revising its policies and procedures.

80.     GSM also assured Ultraflex that GSM's consulting services would produce direct results for approximately $75,000.  GSM had no intention of charging Ultraflex only $75,000.

81.     As a result of the many verbal and written statements made by GSM's employees, which statements GSM knew were untrue when made, Ultraflex relied upon such misrepresentations to its detriment.

82.     In an effort to salvage a bad situation, Ultraflex was induced to GSM to pay more money to try to ameliorate the many deficiencies, and wound up paying GSM approximately $150,000 over a 17-day period for which Ultraflex still received little or no benefit.

83.     As a result of GSM's fraudulent conduct, Ultraflex was induced to pay substantial money to GSM that should be returned in full.

84.     GSM intended that Ultraflex would rely on its misrepresentations to permit GSM to remain in a position where it could collect large amounts of money.

85.     Ultraflex reasonably relied to its detriment on the misrepresentations made.

86.     As a result of GSM's misrepresentations, Ultraflex has sustained actual and substantial damage to its business.

### THIRD COUNT
### (Breach of Contract)

87.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein at length.

1332620

88.     GSM has failed to provide services in conformity with the Agreement.

89.     GSM has failed to act fairly and in good faith in providing services to Ultraflex, and failed to honor its commitments that it would provide efficient and high quality services.

90.     Ultraflex has satisfied and performed each of its obligations as contractually required by the Agreement.

91.     As a result of the foregoing breach of contract, Ultraflex has been damaged, and demands judgment against GSM for all direct, consequential and incidental damages.

## FOURTH COUNT
### (Breach of Fiduciary Duty)

92.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

93.     During the period that it was providing confidential services to Ultraflex, GSM stood in a relationship of confidence and trust, and owed Ultraflex fiduciary duties of loyalty, honesty, full disclosure and freedom from self-dealing in carrying out its duties.

94.     GSM's fiduciary duties also included an obligation to act in the best interests of Ultraflex when carrying out its responsibilities.

95.     The power to control the charges and expenses incurred was fully entrusted to GSM to enable it to fulfill its responsibilities in furtherance of Ultraflex's best interests.

96.     As set forth above, GSM abused its discretion and power over Ultraflex for its own personal advantage, and intentionally or recklessly breached its fiduciary duties to Ultraflex by invoicing and charging Ultraflex excessive and unreasonably high amounts of money for self gain, without proper regard to: (a) the poor quality of the consulting services being rendered, (b) work product produced without regard to its true value or utility to Ultraflex, (c) giving any

advance notice to Ultraflex of the charges to be incurred and work that would be undertaken, (d) Ultraflex's reasonable expectations, and (e) the specific representations made to Mr. Schleicher to induce Ultraflex to retain GSM.

97.    GSM's actions in breach of its fiduciary duties were committed with knowing and reckless disregard for Ultraflex's rights.

98.    As a proximate result of GSM's actions, Ultraflex has suffered actual and substantial damage to its business.

## FIFTH COUNT
### (Conversion)

99.    Plaintiff repeats and realleges each of the allegations contained above as if fully set forth herein.

100.    GSM wrongfully refused to return all private documents and information entrusted to GSM by Ultraflex once GSM's services were terminated.

101.    Defendant has exercised the right of ownership over property without permission or authorization.

102.    As a proximate result of GSM's conversion, it has exercised dominion and control over property that rightfully belongs to Ultraflex.

103.    As a result of the foregoing, Ultraflex demands judgment returning all property as requested and awarding it compensatory damages, including costs of suit.

1332620

## SIXTH COUNT
### (Trespass)

104.    Plaintiff repeats and incorporates by reference the allegations contained in each paragraph above as if fully set forth herein.

105.    As set forth above, GSM wrongfully refused to leave Ultraflex's premises once GSM's services were terminated.

106.    GSM's staff executive Margret Drorbaugh remained on Ultraflex's premises and had to be escorted from the premises.

107.    As a result of the foregoing, Ultraflex demands judgment awarding it compensatory damages, including costs of suit.

## SEVENTH COUNT
### (Punitive Damages)

108.    Plaintiff repeats and incorporates by reference each and every allegation set forth above as if set forth herein at length.

109.    By virtue of GSM's deliberate and wanton conduct as described herein, Ultraflex has suffered damages actuated by actual malice and/or by a wanton and willful disregard of Ultraflex's rights.

110.    Defendant knew or should have known that its tortious conduct would harm Ultraflex.

111.    The compensatory damages that Ultraflex has suffered arose directly from Defendant's unlawful and wanton conduct.

1332620

112.   Defendant acted with reckless disregard for the Ultraflex's rights and/or damages that Plaintiff would incur.

113.   As a result of the foregoing, GSM has profited at Ultraflex's direct expense.

114.   As a result of the foregoing, Ultraflex demands judgment against GSM in the sum of the greater of $350,000 or five times the amount of compensatory damages awarded as and for punitive damages as authorized in N.J.S.A. § 2A:15-5.10 *et seq.*

**WHEREFORE,** Plaintiff Ultraflex Systems, Inc. demands judgment against Defendant George S. May International Corporation on each count above, awarding Ultraflex all direct, compensatory, punitive, treble, consequential, and incidental damages as authorized by law, including all reasonable attorneys' fees incurred, interest, and costs of suit, together with such other and additional relief as warranted and as deemed just and proper.

Dated: December 29, 2009

**PORZIO BROMBERG & NEWMAN, P.C.**

By: _____
Gary M. Fellner (GF -7486)

100 Southgate Parkway
Morristown, New Jersey 07962
(973) 538-4006
gmfellner@pbnlaw.com
*Attorneys for Plaintiff Ultraflex Systems Inc.*

1332620

## JURY DEMAND

Plaintiff demands a jury on all counts so triable under the laws of the United States of America.

Dated: December 29, 2009

**PORZIO BROMBERG & NEWMAN, P.C.**

By: _____

Gary M. Fellner (GF -7486)

100 Southgate Parkway
Morristown, New Jersey 07962
(973) 538-4006
gmfellner@pbnlaw.com
*Attorneys for Plaintiff Ultraflex Systems Inc.*

1332620